

| | | |
|---|---|---|
| Daniel Gilpin | : | |
| | : | |
| Claimant | : | |
| | : | JAMS ARBITRATION |
| v. | : | REF # 5440001752 |
| | : | |
| | : | |
| TitleMax of South Carolina, Inc., | : | |
| | : | |
| Respondent | : | |

_____

## FINAL AWARD

**Counsel for Claimant:**
**Drew Brown, Esquire**
**James Faucher, Esquire**
Brown, Faucher, Peraldo & Benson, PPLC
822 N. Elm St., Suite 200
Greensboro, NC 27401-1538
Telephone: (336) 478-6000

**Counsel for Respondent**
**Rachel Hodges, Esquire**
**Ryan Strasser, Esquire**
Troutman Pepper Locke, LLP
401 9th St., N.W., Suite 1000
Washington, DC 20004-2134
Telephone: (202) 274-2950

**Erin Harrigan, Esquire**
Troutman Pepper Locke, LLP
1001 Haxall Pt., 15th Floor
Richmond, VA 23219

Final Award                                                                 1

**Arbitrator:**
**Gregory P. Miller, Esquire**
JAMS
1717 Arch St., Suite 3810
Philadelphia, PA  19103
Telephone: (215) 246-9494

**Case Manager:**
**Tony Abata**
JAMS
1717 Arch St., Suite 3810
Philadelphia, PA 19103
Telephone: (267) 947-2489

## FINAL AWARD

THE UNDERSIGNED ARBITRATOR, having been designated in accordance with Paragraph 24 of four Motor Vehicle Title Loan Agreements, Promissory Notes, and Security Agreements (the "Loan Agreements") between Daniel Gilpin ("Claimant" or "Mr. Gilpin") and TitleMax of South Carolina, Inc., ("Respondent" or "TitleMax") executed on or about February 13, 2018, August 28, 2018, May 20 2020 and July 17, 2021, (collectively, the "Loan Agreements")  and having examined the submissions, evidence, and relevant law, finds, concludes, and issues this Final Award:

### I.    Introduction

The Claimant asserts statutory claims under North Carolina law against the Respondent, alleging the interest rate charged in the Loan Agreements exceeded the rate permitted under North Carolina law. He seeks damages in the full amount recoverable under North Carolina law.

The Respondent asserts that under the Loan Agreements' Governing Law Provision, South Carolina law applies to all disputes related to the Loan Agreements. Accordingly, it cannot be held liable for claims asserted under North Carolina law. Further, the Respondent asserts that even if the North Carolina law was held to apply, the Claimant has not established that TitleMax engaged in any "contractual activities" within the State of North Carolina specifically delineated as the basis for the statute's application.

### II.    Procedural Statement

The Claimant was originally part of an action filed by numerous individual plaintiffs in North Carolina, in the General Court of Justice, Superior Court Division, Guilford County, on November 30, 2023, against TMX Finance of Virginia, Inc.; TitleMax of South Carolina, Inc.;

Final Award                                                                2

TMX Finance, LLC; TMX Finance of Virginia, Inc.; TMX Finance of Tennessee Inc; TitleMax Finance of Tennessee, Inc.; TMX of Tennessee.; and TitleMax of Georgia Inc., (the "TitleMax Companies"). On January 5, 2024, the TitleMax Companies filed a Petition for Removal. On January 9, 2024, the matters were assigned to the Honorable Thomas D. Schroeder, United States District Court Judge for the Middle District of North Carolina. On September 18, 2024, Judge Schroeder granted the Plaintiffs' Motion to Compel Arbitration and stayed the action pending the resolution of the individual arbitrations in accordance with their Loan Agreement arbitration provisions.

This matter was commenced with JAMS on January 2, 2025. On February 15, 2025, the Claimant filed his Specific Complaint ("Demand") with JAMS. In his Demand, the Claimant asserted claims against the Respondent for Violation of the North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-165, et seq. (for underlying claims) ("CFA") ("First Claim for Relief"); Violation of the North Carolina usury law, N.C. Gen. Stat. § 24-1.1 et seq. (claim in the alternative) ("Usury Law") ("Second Claim for Relief"); Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 ("UDTPA") ("Third Claim for Relief") and a claim for punitive damages as permitted by North Carolina law pursuant to N.C. Gen. Stat. 1D. ("Fourth Claim for Relief"). (Demand at ¶¶ 24-54.[1] These claims relate to all of the Loan Agreements.

On January 17, 2025, Gregory P. Miller, Esquire, was appointed Arbitrator for this matter. The Parties acknowledged receiving the Arbitrator's signed disclosures and agreed to the Arbitrator's qualifications. The Parties confirmed they have no objection to the Arbitrator serving in this matter.

This Arbitration was administered pursuant to the JAMS Comprehensive Arbitration Rules and Procedure ("JAMS Rules"), subject to agreed-upon modifications proposed by the Parties and approved by the Arbitrator. The JAMS Policy on Consumer Arbitration, Pursuant to the Pre-Dispute Clause, Minimum Standards of Procedural Fairness apply.

On February 20, 2025, the Arbitrator held the Preliminary Management Conference, as required under JAMS Rule 16. Prior to that Conference, the Parties submitted a Proposed Joint Scheduling Order.[2] Under the proposed Order, both Parties planned on submitting Motions for Summary Disposition under JAMS Rule 18. The Arbitrator approved the proposed Schedule Order and incorporated its terms into Case Management Scheduling Order No. 1 ("CMSO No. 1"). The Parties voluntarily exchanged documents regarding the Claimant's business relationship with the Respondent, as required under CMSO No. 1 and JAMS Rule 17.

On March 14, 2025, the Respondent submitted its Answer to the Specific Complaint. ("TitleMax's Answer"). In addition to General Denials, the Respondent asserted it cannot be held liable for alleged violations of North Carolina statutes because the Loan Agreements' Governing Law Provisions require the application of South Carolina law for any disputes that arise under

---

[1] On January 8, 2025, TitleMax submitted Respondent's Answering Statement and Preservation of Rights in Response to Claimant's Arbitration Demand.
[2] In the proposed Scheduling Order, both Parties agreed to the filing of Dispositive Motions.

Final Award                                                                                              3

the Loan Agreements. The Answer also asserts various defenses, including a statute of limitations defense.

## A. <u>Claimant's Motion for Summary Disposition</u>

On April 4, 2025, Mr. Gilpin submitted the "Claimant's Dispositive Motion & Memorandum" ("Claimant's Summary Disposition Motion"). In this Motion, the Claimant sought an Interim Award in his favor granting him: (1) a Chapter 75 award of the payments taken ($21,356.28) trebled to $64,068.84;  (2) a compensatory award of ($21,356.28) and punitive damages (in the discretion of the Arbitrator); (3) the ability to choose the higher of the two awards after verdict and before judgment;  (4) the permitted interest on the base amount back to the date of filing (but only if the Arbitrator says so), at the legal rate (8%) back to the date of filing of the Complaint now pending in the Middle District of North Carolina; (5) post award interest (8%) on the entire amount awarded; and (6) the right to recover reasonable attorney's fees pursuant to N.C.G.S. § 75-16.1 in a subsequent final award after the submission of an Affidavit of Fees. (Claimant's SD Mot. at 37.)

The Claimant argues that he should prevail on his claims because "In the Summer of 2022, the North Carolina Court of Appeals determined that North Carolina law applies to loan providers who choose to enter North Carolina and are violating the North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-190 as well as the North Carolina Unfair and Deceptive Trade Practices Act." (*Id.* at 2). The Claimant's position is partly based on several North Carolina appellate court decisions he argues bind the Arbitrator. See e.g., *Wall v. Automoney, Inc.*, 284 N.C. App. 514, 877 S.E.2d 37 (N.C. Ct. App. 2022); *Troublefield v. Automoney, Inc.,* 284 N.C. App. 494, 876 S.E.2d 790 (N.C. Ct. App. 2022); *Smith v. Automoney, Inc.,* No. COA21-271, 2022 N.C. App. LEXIS 508, 2022 WL 2815344 (N.C. Ct. App. July 19, 2022); *Leake v. AutoMoney, Inc.*, 284 N.C. App. 389, 877 S.E.2d 22 (N.C. Ct. App. 2022); *Hundley v. AutoMoney, Inc.* 284 N.C. App. 378, 876 S.E.2d 765 (N.C. Ct. App. 2022) (the "AutoMoney Decisions") (Claimant's SD Mot. Ex. B.) The Claimant asserts the AutoMoney Decisions confirm that the "choice of law and forum selection clauses [as present in this matter] are unenforceable in North Carolina's state and federal Courts in regard to out of state car title loans." (*Id*. at 8.)

The Claimant contends, "The loans that TitleMax made to [him] violate Chapter 53. These interest charges are well in excess of what is permitted (30%) under North Carolina law. Therefore, the loans are ***void.*** Section 53-166(d) further prohibits TitleMax from 'collect[ing], receiv[ing], or retain[ing] any principal or charges whatsoever with respect to the loan[s].' Therefore, for the purpose of calculating Claimant's damages, the baseline is that TitleMax was not entitled to anything from Claimant: not interest (lawful or not) and not repayment of principal." (Claimant's SD Mot. at 14.)

The Claimant submitted the individualized facts in support of his Motion through his personal Declaration. (See Ex. G., Gilpin Declaration.) He contends this Declaration demonstrates that there was "discussion (initial call), negotiation (call), solicitations (subsequent calls), lien recordings with the North Carolina DMV (in NC), and payments (in NC) – any one of which means Claimant prevails." (*Id.* at 5.)

Final Award                                                                                                    4

Mr. Gilpin also submitted the statements of former TitleMax employees that he contends show these former employees have "admitted in sworn statements and depositions that [TitleMax] regularly records the liens in North Carolina, takes cars in North Carolina, and engages in discussions during the opening phone call from North Carolina which include substantive aspects of the arrangement. TitleMax then uses the North Carolina legal system to "enforce" its "rights" in the North Carolina via a lien that it drives or mails into North Carolina to record. (*See* Ex. D., Pack Deposition, at 9-13; Ex. E., Jessica Crowley Affidavit, at 10-15; Ex. E., Medley Affidavit, at 5-6.)

The Claimant also addressed the Constitutional defenses raised in TitleMax's Answer. Generally, the Claimant contends "TitleMax's Constitutional defenses all failed for the simple reason that it is not conducting its activities "entirely" or "wholly" out of state. Once TitleMax chooses to enter North Carolina and take action, it subjects itself to North Carolina's Consumer Finance Act." (*Id.* at 3.)

## B.  Respondent's Motion for Summary Disposition

On April 4, 2025, the Respondent submitted TitleMax of South Carolina, Inc.'s Dispositive Motion. ("Respondent's SD Motion".) In its Motion, the Respondent requested that the Arbitrator issue a final award finding in TitleMax's favor and rejecting all of Claimant's asserted claims.[3]

Ms. Craft also stated, "TitleMax makes loans at its stores throughout South Carolina, but does not have any stores or presence in North Carolina." (Ex. A, Affidavit of Christy Craft ¶ 50.) "TitleMax specifically does not market to residents of North Carolina through radio, television, billboard, mailed advertisements, telephonic solicitation, or otherwise for motor vehicle title loans." (*Id.* ¶ 6.) "Prospective borrowers seeking title-secured loans can only complete a credit application, have their vehicle appraised, and obtain loan origination approval while physically present in a TitleMax store. TitleMax employees cannot and do not enter into any loan agreements (or promise to enter into any loan agreements) over the phone." (*Id.* ¶ 7.) "After loan origination is completed, a customer receives the loan proceeds while physically present in a South Carolina store." (*Id.* ¶ 8.) Ms. Craft does not explicitly refer to Mr. Gilpin or his Loan Agreements.

TitleMax argues the "Claimant voluntarily travelled to South Carolina to obtain loan products from TitleMax that were unavailable where they resided. While in South Carolina, Claimant executed loan agreements with TitleMax to obtain loans secured by their motor vehicle (the "Contracts".) The Contracts contained an enforceable South Carolina choice-of-law provision and repayment terms expressly regulated by, and in compliance with, South Carolina law. Claimant also willingly took the loan proceeds given to [him] in South Carolina as a result of [his] voluntary decision to execute the Contracts." (Resp't's SD Mot. at 1.)

---

[3] Atkinson, Baker & Rodriquez, P.C., counsel to the Respondent at the time of this filing was ultimately replaced by Troutman Pepper Locke, LLP.

The Respondent argues Mr. Gilpin's claims rely "entirely on [his] contention that certain alleged facts require this Arbitrator to apply North Carolina law, notwithstanding the parties' express and consensual agreements that South Carolina law controls." (*Id.* at 2.) The Respondent contends that, even assuming that all of the facts Claimant alleges are true, "North Carolina law cannot be forced upon the Contracts, and TitleMax is entitled to judgment in its favor for the following independent reasons:

- The Federal Arbitration Act ("FAA") and decades of Supreme Court and Fourth Circuit precedent mandate that an Arbitrator apply the parties' agreed-upon choice-of-law provision in the Contracts and decide this case under South Carolina, not North Carolina, law. (citations omitted).
- The Due Process Clause forbids Claimant's application of North Carolina's entire finance regulatory scheme to a South Carolina business and contracts. Application of North Carolina substantive law to these facts would be "arbitrary" and "fundamentally unfair" where neither party, at the time of the disputed interactions, expected the application of South Carolina law. (citations omitted).
- Claimant's interpretation of North Carolina law cannot stand because, as applied here, the North Carolina laws on which Claimant relies run afoul of additional constitutional safeguards, including the First Amendment. (citations omitted).
- Claimant's interpretation of the law should not be adopted because it would lead to absurd results that ignore the realities of modern commerce.
- Even if the Arbitrator could ignore both the parties' unambiguous agreement that South Carolina law controls the Contracts and Claimant's unconstitutional application of North Carolina law, North Carolina's choice-of-law analysis requires the application of South Carolina substantive law under the most significant relationship and lex loci, or last act necessary, tests. *See,* e.g., *Michael v. Greene*, 63 N.C. App. 713, 715 (N.C. Ct. App. 1983); *United Virginia Bank v. Air-Lift Assocs.,* 79 N.C. App. 315, 321-22 (N.C. Ct. App. 1986)." (Resp't's SD Mot. at 2-3.)[4]

TitleMax argues the Statute of Limitations bars the claims asserted by the Claimant. "The relevant statutes of limitations are as follows: (i) two years after a cause of action accrues for usury, N.C. Gen. Stat. §1-53(2)-(3) and (ii) three years after a cause of actions accrues for violations of the North Carolina Consumer Finance Act (N.C. Gen. Stat. § 53-165, et seq.), Id. §1-52(2)." (*Id.* at 29.) TitleMax contends the Claimant "voluntarily traveled on February 13, 2018, August 28, 2018, and March 20, 2020, outside of North Carolina to TitleMax's location in Fort Mill, South Carolina, and entered into contracts with TitleMax." (*Id.* at 30.)."On November 30, 2023, Claimant initiated the action underlying this arbitration against TitleMax, asserting claims under the CFA, North Carolina usury statutes, and a violation of the UDTPA predicated upon the alleged violation of the CFA. These claims are time-barred pursuant to the respective applicable statute of limitations. Consequently, Claimant is precluded from proceeding with any claims or seeking recovery from TitleMax regarding the 2018 and 2020 Contracts, irrespective of whether North Carolina law applies." (*Id.*)

---

[4] The Respondent contends the *AutoMoney* Decisions' non-binding guidance fail to take into account several dispositive legal considerations, that it submits must be addressed by the Arbitrator. The Respondent further argues denial of the Claimant's Dispositive Motion is mandated by these considerations and the facts and evidence it has submitted to the Arbitrator.

Final Award                                                                                          6

TitleMax further argues, "[T]he continuing wrong doctrine cannot resurrect Claimant's untimely claims. Alleged violations of the North Carolina usury law and the CFA are not akin to continuing torts and are not subject to the continuing wrong doctrine. First, Claimant's claims are not tort claims. Rather, they are contract claims. Under North Carolina law, a claim to recover a statutory penalty in connection with an underlying contract (such as the double interest penalty under the North Carolina usury laws, the disgorgement penalty under the CFA, or treble damages under the UDTPA) 'is considered to be an action [in] contract' and is not an action in tort." *Commercial Finance Co. v. Holder,* 235 N.C. 96, 99 (N.C. 1952) (emphasis added)." (*Id.* at 31.)

TitleMax contends that since Claimant's claims are time-barred with respect to the February 13, 2018, August 28, 2018, and March 20, 2020, loans, TitleMax's Motion should be granted and a final award finding in its favor and rejecting all of the Claimant's asserted claims should be issued.

If the event the Arbitrator does not rule in its favor, the Respondent also "challenges the Claimant's damages calculation, stating that the damage calculation "reflects Claimant's gross misunderstanding of law." (*Id.* at 31.) This purported misunderstanding would "require the Arbitrator to conflate, then apply in tandem, two wholly distinct frameworks for determining damages – a result expressly prohibited by North Carolina law." (*Id.*)

On April 14, 2025, Mr. Gilpin submitted the Claimant's Response in Opposition to TitleMax's Dispositive Motion. ("Claimant's SD Opposition".) In his Opposition, Mr. Gilpin argues "The North Carolina Court of Appeals rulings are and remain - now that the Supreme Court has denied petitions for review - the applicable and controlling law regarding choice of law analysis to be applied to claims pending in North Carolina's courts." (Claimant's SD Opp. at 4-5.) Those courts, "in this exact context then lay out the North Carolina choice of law process in the AutoMoney cases. The choice of law provision is unenforceable, and the doctrine of *lex loci contractus* does not apply because these are not contract claims." (*Id.* at 2-3.) He also cites numerous court and arbitration decisions that reject the Respondent's argument that the choice-of-law provisions in the Loan Agreements mandate the application of South Carolina law.[5]

In response to TitleMax's assertion that his claims are time-barred, the Claimant argues, "North Carolina courts have explicitly determined this issue in this exact setting. The retention of the payment is a separate and distinct violation of North Carolina law." *Poe v. F&B Financial*, 23CVS7736 (N.C. Super. Ct. July 23, 2024) (Statute of limitations in North Carolina on CFA and UDTPA claims does not accrue until car title loan lender stops retaining the payments)." (Claimant's SD Opp. at 36.)

On April 18, 2025, the Respondent submitted TitleMax's Opposition to Claimant's Dispositive Motion. ("Respondent's SD Opposition".) In its Opposition, TitleMax challenged the sufficiency of the evidence offered by the Claimant. TitleMax asserts the "Claimant's sole evidence—a self-serving declaration—does not, and cannot, establish the delineated factual predicates required to establish liability under N.C. Gen. Stat. § 53-190(a). The Declaration follows a familiar, often-duplicated pattern of allegations that nearly every Claimant asserts (but have yet to produce corroborating evidence to support) against TitleMax. However, and to be

---

[5] These opinions and awards will be discussed, as needed, in the Award in this matter.

Final Award                                                                                                  7

abundantly clear, Claimant has not submitted uncontested facts or evidence showing contact with, or interactions with, TitleMax sufficient to confer liability. The Claimant's only evidence is a self-serving declaration, which has not been tested by cross-examination. Under the analogous Fed. R. Civ. P. 56 standard, '[a] self-serving affidavit, without more, is not sufficient to defeat summary judgment.' *Jeandron v. Board of Regents of University System of Maryland*, 510 Fed. Appx. 223, 228 (4th Cir. 2013)." (Resp't's SD Opp. at 17.)

TitleMax further argues, "Claimant has failed to establish summary disposition is warranted because: (1) there is no binding legal authority invalidating the parties' choice-of-law provisions; (2) Claimant does not—and cannot—explain why the asserted interpretation of the Consumer Finance Act survives constitutional challenges under binding precedent of the U.S. Supreme Court and Fourth Circuit; (3) the presentation of facts submitted by Claimant do not enable the Arbitrator to find that TitleMax violated the Consumer Finance Act; (4) N.C. Gen. Stat. § 53-190 does not subject TitleMax to North Carolina statutes and (5) Claimant's proposed damage calculation is prohibited under North Carolina law." (Resp't's SD Opp. at 1.)

### C.  Case Management & Scheduling Order No. 3

On July 14, 2025, the Arbitrator denied the Claimant's Motion for Summary Disposition. ("CMSO No. 3"). The Arbitrator determined the factual submission, in support of its Motion for Summary Disposition, was insufficient to sustain its burden of proof for a Final Award finding in its favor. Finally, TitleMax also failed to submit clear and convincing evidence that the Respondent's conduct constitutes the aggravating factors that justify an award of punitive damages. The remaining issues and arguments raised by the Claimant in his Motion will be addressed in the Award.

On July 14, 2025, the Arbitrator denied the Respondent's Motion for Summary Disposition. ("CMSO No. 3"). The Arbitrator determined the factual submission, in support of its Motion for Summary Disposition, insufficient to sustain its burden of proof for a Final Award finding in its favor. Finally, TitleMax also failed to submit clear and convincing evidence that its conduct does not constitute the aggravating factors that justify an award of punitive damages. The remaining issues and arguments raised by the Respondent in its Motion will be addressed in this Award.

The Arbitrator, however, addressed the Choice of Law issues raised by the Parties in their respective Motions. In CMSO No. 3, the Arbitrator conducted a conflict-of-law analysis applying the Restatement (Second) of Conflicts of Laws §§ 187 and 188.[6] The Arbitrator concluded that both North Carolina and South Carolina courts, under the relevant Conflict of Law analysis, would not enforce the Loan Agreements' Governing Law provisions and the Claimant would be allowed to pursue his North Carolina claims.[7] Therefore, the Arbitrator ruled the Claimant could pursue his North Carolina statutory claims.

The Arbitrator held a conference call on June 30, 2025, to discuss the scheduling of the Hearing and the procedure for addressing the issues that were not resolved by the rulings on the

---

[6] The facts, as asserted, were sufficient to perform this analysis.
[7] That analysis is set forth in CMSO No. 3 and will not be repeated here.

Final Award                                                                                           8

Motions for Summary Disposition. The Arbitrator directed the Parties to submit Pre-Hearing briefs on or before July 30, 2025, on the subjects raised during this conference. The Arbitration Hearing was held on August 28, 2025.

On July 30, 2025, Mr. Gilpin submitted Claimant's Pre-Hearing Brief. ("Gilpin's Pre-Hearing Brief".) The Claimant identified the information previously submitted that demonstrates Mr. Gilpin executed lien recording applications contemporaneously with other loan documents, and that he was charged fees associated with recording TitleMax's liens in North Carolina. Also, as requested, the Claimant addressed the admissibility of the Crowley and Medley Testimony and the factual and legal basis for his request for punitive damages.[8]

On July 30, 2025, the Respondent submitted TitleMax of South Carolina, Inc.'s Pre-Hearing Brief. ("TitleMax's Pre-Hearing Brief".) The Respondent argues the Claimant "neither pled with any specificity required by North Carolina law aggravating factors that give rise to a claim for punitive damages, nor can produce any clear and convincing evidence that establishes any of the statutorily required aggravating factors. There is no evidence that TitleMax engaged in any conduct that was fraudulent, malicious, or willful and wanton under North Carolina law." (TitleMax's Pre-Hearing Brief at 2.)

The Respondent further argues, "As with treble damages under the UDTPA, punitive damages cannot be applied to a statutory penalty that already punishes a defendant as opposed to restoring a claimant to their original condition. Accordingly, North Carolina law prohibits the use of punitive damages to provide additional punishment to a statutory penalty." (*Id.*)

The Respondent submitted as Exhibit A, the Declaration of Christopher Dunn, the Director of Operations at TitleMax, that sets forth several actions taken by TitleMax in connection with its lending activities in North Carolina. (Ex. A., Dunn Declaration, TitleMax Pre-Hearing Brief.) The Respondent contends these actions support its argument that an award of punitive damages is not appropriate in the matter.

The Hearing was held on August 28, 2025, via ZOOM. Prior to the hearing, both Parties submitted a proposed witness and exhibit list. All proposed exhibits were admitted into evidence. Mr. Gilpin and Mr. Dunn testified.

### D. **Interim Award**

On September 23, 2025, the Arbitrator, after examining the submissions, evidence, and relevant law, issued an Interim Award in this matter. The determinations in the Interim Award are adopted and incorporated by reference.

### 1. **Undisputed Facts**

Based on the Parties' Submissions and the testimony offered at the Hearing, the following is a statement of the undisputed facts found by the Arbitrator to be necessary for the Order on the Dispositive Motions and Interim Award. To the extent that this recitation differs from any Party's

---

[8] Both Parties submitted Responses to the opposing Party's Pre-Hearing Brief.

Final Award                                                                                                  9

position on the facts, that is the result of the Arbitrator weighing the evidence offered and making relevancy determinations.

The Claimant is a citizen and resident of North Carolina, having lived in the state at all relevant times. He is a trained mechanic and has worked at several jobs. As a result of a divorce, his credit scores were low, and, after several attempts, he was unable to get a loan to address his financial needs. He learned about TitleMax on the internet.

Although Mr. Gilpin was gainfully employed, his recent divorce damaged his credit record. After several attempts to obtain credit through traditional sources, he turned to TitleMax. He called TitleMax from North Carolina and asked the TitleMax employee who answered if they gave loans to North Carolina residents. The TitleMax employee responded that they did. He discussed with the TitleMax employee the type of car that he had and its mileage. The car was a 2002 Chevrolet Avalanche. The TitleMax employee told him to bring his North Carolina car title, driver's license, and car to the TitleMax office in Fort Mill, South Carolina. He only had enough money for gas to get to the TitleMax office.

He discussed a rough amount he wanted to borrow with the TitleMax employee over the phone. Based on that conversation, he drove to get the loan. He would not have made the trip if he didn't believe he would get the loan. Mr. Gilpin's telephone conversation with TitleMax, while he was in North Carolina constituted a "solicitation' within the meaning of N.C. Gen. Stat. § 53-190(a).

When he arrived at the TitleMax office, they inspected his car and approved him for a loan. He remembers seeing the loan agreement on a computer screen but did not read it. He understood that by signing the documents, he allowed TitleMax to record a lien on his car.[9]

His first loan with TitleMax was executed on February 13, 2018. ("February 2018, Loan"). He received $1,900.00 and was obligated to pay $11,623.69 during the three-year term of the agreement. The Annual Percentage rate for the loan was 186.05%. This rate exceeded the rate allowable under N.C. Gen. Stat. § 53-176. His monthly payment was $317.99. Out of the proceeds of the loan, he paid $20.00 as a Lien Filing Fee. He made monthly payments of $2,029.84 from March 2018 to August 2018. Mr. Gilpin recalls TitleMax frequently calling him about refinancing his loan. Mr. Gilpin refinanced and paid off this loan on August 28, 2018.

On August 28, 2018, Mr. Gilpin travelled to TitleMax's location in Fort Mill, South Carolina, and executed a second Contract with TitleMax. ("August 2018, Loan"). Under this new loan, he received no additional money and was obligated to pay $10,754.93 during the three-year term of the agreement. The Annual Percentage rate for the loan was 177.18%. This rate exceeded the rate allowable under N.C. Gen. Stat. § 53-176. His monthly payment was reduced by approximately $17.00. He continued to make payments until he paid off the loan on February 29, 2020. He made payments totaling $6,742.10 from September 2018 through February 2020.

---

[9] TitleMax does not dispute it placed a lien on the Claimant's vehicle. (TitleMax of South Carolina's Response to Claimant's Pre-Hearing Brief at 1.)

Final Award                                                                                                           10

On March 20, 2020, Mr. Gilpin travelled to TitleMax's location in Fort Mill, South Carolina, and executed a third Contract with TitleMax. ("March 2020, Loan".) He received $1,600.00 and was obligated to pay $8,427.77 during the three-year term of the agreement. From the loan proceeds, he paid $20.00 as a Lien Filing Fee. The Annual Percentage rate for the loan was 164.97%. This rate exceeded the rate allowable under N.C. Gen. Stat. § 53-176. His monthly payment was $232.17. He continued to make payments until he paid off the loan on March 28, 2021. He made payments totaling $4,373.24 from March 2020 to March 2021.

On July 17, 2021, Mr. Gilpin travelled to TitleMax's location in Fort Mill, South Carolina, and executed a fourth Contract with TitleMax. ("July 2021, Loan"). He received $1,971.50 and was obligated to pay $ 10,952.35 during the three-year term of the agreement. From the loan proceeds, he paid $21.50 as a Lien Filing Fee. The Annual Percentage rate for the loan increased 176.15%. This rate exceeded the rate allowable under N.C. Gen. Stat. § 53-176. His monthly payment was $300.10. He continued to make payments until he paid off the loan on May 24, 2023. He made payments totaling $4,373.24 from July 2020 through May 2023.

He made payments from North Carolina over the phone using his debit card. TitleMax's conduct in accepting payments from Mr. Gilpin constitutes the "receipt of funds from North Carolina" within the meaning of N.C. Gen. Stat. § 53-190(a).

While he was making payments, Titlemax contacted him in North Carolina and encouraged him to return for additional loans. TitleMax's conduct in contacting him while he was in North Carolina and encouraging him to borrow more money constituted a "solicitation' within the meaning of N.C. Gen. Stat. § 53-190(a). Unfortunately, he did go back for additional money several more times.

TitleMax's interactions with Mr. Gilpin were consistent with the routine practices it used to secure loans from North Carolina citizens. According to TitleMax's former employee, Taylor Caddell Pack, when prospective customers called TitleMax, they would be told, as Mr. Gilpin was told, that there was a good chance that they could get some type of loan if they brought their car and title to the TitleMax office, there was no lien on the car, and it was in good condition. TitleMax's interactions with Mr. Gilpin were also consistent with the routine practices it used to secure additional loans from current customers who were North Carolina citizens. According to TitleMax's former employee Darren Medley, as part of TitleMax's marketing and sales programs, he routinely made calls to former customers for the purpose of selling them another loan. The calls included calls to North Carolina.[10]

According to Mr. Dunn, TitleMax's Director of Operations, as of September 2021, TitleMax "stopped offering and no longer offers title loans to North Carolina residents from any TitleMax location." (Ex. A., ¶ 5, Dunn Declaration, TitleMax Pre-Hearing Brief.) TitleMax also "TitleMax ceased permitting the recovery of North Carolina borrowers' vehicles no later than March 3, 2023." (*Id.* ¶ 6.) Beginning on July 21, 2025, TitleMax has initiated a process under which TitleMax, on a rolling basis, "will notify borrowers that (1) their outstanding loan is

---

[10] The statements of Taylor Caddell Pack and Darren Medly, former TitleMax employees is accepted as evidence of the routine practice of an organization under North Carolina Rules of Evidence, Rule 406. The evidence proves that the Mr. Gilpin's interactions with TitleMax employees was a routine practice of TitleMax.

Final Award                                                                                          11

considered paid in full; (2) TitleMax will not accept any additional payments associated with the identified loan; and (3) that the lien on the title to the vehicle securing the loan is released." (*Id.* ¶ 11.) Mr. Gilpin has not benefited from any of TitleMax's recent remedial actions.

## 2.  Analysis

### a.  The Governing Law Provision does not preclude the Claimant's claims.

The Arbitrator ruled in CMSO No. 3, the Loan Agreements' Governing Law Provision did not preclude the Claimant from pursuing the North Carolina statutory claims asserted in his Demand. The Arbitrator's Ruling was based on a conflict-of-law analysis under both North Carolina and South Carolina law, which determined that neither jurisdiction would enforce the Loan Agreements' Governing Law Provisions. That analysis accepted as binding precedent the *AutoMoney* Decisions, which held that enforcement of the Provision would violate North Carolina's fundamental public policy to protect North Carolina resident borrowers through the application of the North Carolina Consumer Finance, the North Carolina Unfair and Deceptive Trade Practices Act, and the North Carolina usury laws. *See Troublefield v. AutoMoney, Inc.*, 284 N.C. App. 494, 510, 876 S.E.2d 790, 803 (N.C. Ct. App. 2022); *see also Wall v. AutoMoney, Inc.,* 284 N.C. App. 514, 532-33, 877 S.E.2d 37, 53 (N.C. Ct. App. 2022).

### b.  The Respondent failed to meet its burden in proving its Asserted Defenses [11]

**Federal Arbitration Act.** The Respondent contends, "The Federal Arbitration Act bars arbitrators from "exceeding their powers" by disregarding a choice-of-law provision that replaces the choice of law analysis. *Snipes v. TitleMax of Virginia, Inc.,* 285 N.C. App. 176, 186 (2022); *Mastrobuono v. Shearson Lehman Hutton*, Inc., 514 U.S. 52, 59 (1995)." (TitleMax's Answer at 17-18.) The Arbitrator's determination is consistent with his obligation under the FAA, Supreme Court jurisprudence, Court's ruling in *Snipes* and the JAMS Rules. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995) ("[T]he FAA's Primary purpose [is] ensuring that private agreements to arbitrate are enforced according to their terms. . . . Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted.") The Respondent has failed to establish this defense.

**The Due Process Clause.** The Respondent contends, "The Due Process Clause, U.S. Const. amend. XIV, sec. 1, forbids application of North Carolina's entire finance regulatory scheme to a South Carolina business which executed a Contract in South Carolina where the South Carolina Legislature and subsequent South Carolina administrative agencies legalized and approved, respectively, the South Carolina Contract." (TitleMax's Answer at 18.)

The Respondent contends "This constitutional provision prevents application of a State's substantive laws unless the State has 'significant contact' with the underlying litigation "such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague,*

---

[11] Any defenses not specifically discussed are denied, including, but not limited to, the Respondent's defense that the Statute of Limitation partially bars Claimant's claims. *Poe v. F&B Financial*, 23CVS7736 (N.C. Super. Ct. July 23, 2024). (a new cause action arises each week there is an unlawful retention of payments.)

Final Award                                                                                                    12

449 U.S. 302, 313 (1981). A State'" may not abrogate the rights of parties beyond its borders having no relation to anything done or to be done within them.'" *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 822 (1985) (quoting [*Home Ins. Co. v. Dick*], 281 U.S. at 410 [1930]). (Resp't's SD Mot. at 14-15.)

The Respondent failed to prove its substantive due process defense. In evaluating this defense, the Arbitrator determined that permitting the Claimant to proceed with his statutory North Carolina claims is "neither arbitrary nor fundamentally unfair." *Allstate,* 449 U.S. at 312–13. The Arbitrator also evaluated the factors established by the United States Supreme Court for such a determination, including: (1) expectations of the parties, (2) defendant's licensing in the State, (3) conflict of laws, and (4) nature of contacts made." *See Phillips*, 427 U.S. at 816, 821–22; *see also Hague*, 449 U.S. at 318, 327; *Home*, at 408.

The Respondent's registration of its lien in North Carolina and its travel into the state to repossess vehicles are significant contacts within the State of North Carolina that undermine the Respondent's due process argument. The nature of the Respondent's contacts with Mr. Gilpin, including repeatedly calling him to induce him to enter into new loans and refinance existing ones, also undermines the Respondent's argument. The Respondent has failed to establish the defense.

**The First Amendment.** The Respondent contends "Claimant's interpretation of North Carolina law cannot stand because, as applied here, the North Carolina laws on which Claimant relies run afoul of additional constitutional safeguards, including the First Amendment. (citations omitted)." (Resp't's SD Mot. at 2-3.) TitleMax argues, "TitleMax cannot be held liable for violating the North Carolina statutes simply by responding to inquiries from prospective borrowers, i.e. disseminating information about TitleMax's services that were legal in the state where TitleMax was located. The First Amendment prevents the exercise of North Carolina's "power or supervision" that would result in North Carolina laws controlling "the internal affairs of another State merely because the welfare and health of its own citizens may be affected." *Bigelow v. Virginia,* 421 U.S. 809, 824-25. (1975). (*Id.* at 21.)

The Claimant argues, "Neither the North Carolina Consumer Finance Act nor the North Carolina Unfair and Deceptive Trade Practices control speech. Rather, both of those statutes regulate conduct; here, the making of predatory loans to North Carolina residents at interest rates that far exceed the allowable rates of interest under North Carolina law and the collecting/receiving/retaining payments on usurious loans to North Carolina residents, but only where the lender has also engaged in related activities in North Carolina. The "speech" identified in N.C.G.S. §53-190(a) - "discussion" - is actually found in the safe-harbor section of the statute. Moreover, violations of those statutes can occur even in the absence of any speech, either spoken or written, such as a predatory lender's use of the NCDMV and repossessions within the borders of North Carolina, such that any speech associated with the transaction is incidental. *Gift Surplus, LLC v. State of North Carolina Ex Rel, Roy Cooper,* 605 F. Supp. 3d 711, 727 (M.D.N.C. 2022) and *Napco v. Landmark Technology A, LLC,* 555 F. Supp. 3d 189, 216 (M.D.N.C. 2021) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed.")." (Claimant's SD Motion at

Final Award                                                                                                          13

35-36). The Respondent's reliance on *Bigelow* is misplaced. The North Carolina statutes regulate TitleMax's conduct but not its speech.

**The Commerce Clause.** The Respondent contends, "Claimant's interpretation of the law should not be adopted because it would lead to absurd results that ignore the realities of modern commerce". (Resp't's SD Mot. at 2-3.) The defense is the latest interaction of the Respondent's Dormant Commerce Clause argument. The Arbitrator rejects the Respondent's argument that the application of the CFA in this matter violates the Commerce Clause. In most of the prior arbitration matters, the arbitrators, in considering the Respondent's Dormant Commerce Clause argument, have relied on the analysis in *TitleMax of Delaware v. Weissman*. 24 F.4th 230 (3d Cir. 2022). The Circuit Court's analysis is equally applicable in this matter.

TitleMax of Delaware, like TitleMax of Virginia, provided loans to out-of-state individuals who lived in states that limited the interest rates that could be charged on automobile title loans. In that case, the loans were made to Pennsylvania residents. Pennsylvania's Consumer Discount Company Act ("CDCA"), 7 Pa. Stat. §§ 6201-6621, and the Loan Interest and Protection Law ("LIPL"), prohibit loans under certain instances that exceed a maximum permissible interest rate. These statutes gave the Pennsylvania Department of Banking and Securities (the "Department of Banking") authority to enforce these laws. TitleMax, in resisting a subpoena issued by the Department of Banking, filed an action seeking injunctive and declaratory relief, asserting the same dormant Commerce Clause arguments asserted in this matter. The Court of Appeals thoroughly analyzed the arguments raised and concluded that these statutes did not violate the dormant Commerce Clause. The Third Circuit concluded that, "Because TitleMax both receives payment from within Pennsylvania and maintains a security interest in vehicles located in Pennsylvania that it can act upon, its conduct is not "wholly outside' of Pennsylvania." (*Id.* at 239.)

In this matter, the Respondent also received payment from within North Carolina and maintained a security interest in vehicles located in North Carolina that it could enforce; therefore, its conduct was not "wholly outside" North Carolina. The Third Circuit then addressed "the 'territorial scope of the transaction that [Pennsylvania] has attempted to regulate' and whether such transactions occur 'wholly outside' of the state." (*Id.* at 238.) (citations omitted).

After concluding the transactions at issue did not occur wholly outside of Pennsylvania, the Third Circuit analyzed "whether the [regulation] is invalid under the [Pike] balancing test." (*Id.* at 238.) (citation omitted). The balancing test applied was set forth in *Pike v. Bruce Church, Inc*. 397 U.S. 137, 142 (1970). Under that test, "where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." (*Id.* at 142.) After reviewing facts regarding the loan transactions that are virtually identical to the facts in this matter, the Third Circuit concluded "the burdens [from the state law being applied] on interstate commerce substantially outweigh[] the putative local benefits." (*Id.* at 240.) (citations omitted).

The Arbitrator finds the same analysis applies to the application of the CFA and the UDTPA to the TitleMax loans in this matter. Accordingly, the Arbitrator finds the Respondent

Final Award                                                                                                  14

has failed to establish that the Claimant's interpretation of the law would lead to absurd results that ignore the realities of modern commerce if Mr. Gilpin is permitted to proceed with his statutory North Carolina claims in this Arbitration.

<u>c.</u>  **The Claimant met his Burden in Proving the Respondent Violated North Carolina's Consumer Finance Act, N.C. Gen. Stat. § 53-165, et seq. (CFA) (First Claim for Relief)**

The CFA provides:
§ 53-190. Loans made elsewhere.

(a) No loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State. **Provided, the foregoing shall not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occur entirely outside North Carolina.**

(b) If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article.

The undisputed facts establish the Respondent engaged in contractual activities in North Carolina. The broad language in the CFA encompasses, as contractual activities, the Claimant's discussions with a TitleMax employee while he was in North Carolina that included discussions on: (a) whether TitleMax would make a loan to a North Carolina resident, (b) details on the Claimant's vehicle; (c) the potential amount of a loan available; (d) what documents he needed to bring to get a loan; and (e) where he need to go to complete the loan process. It also includes the Respondent's recording of a lien on the Plaintiff's North Carolina vehicle title with the NCDMV, which was part of the loan transaction and contracting process. Also, the Respondent's solicitations to the Claimant to refinance his loan and to enter into additional loans clearly constitute solicitations within the means of the CFA. The undisputed facts prove the Claimant violated the CFA**.**

The remedy for a violation of the Act (either (a) or (b)) is set forth in N.C.G.S. § 53-166(d) which provides that loans that violate the Act "shall be void and the licensee or any other party in violation shall have no right to collect, receive or retain any principal or charges whatsoever with respect to such loan." TitleMax violated the Act and indeed collected, received, or retained money and/or property.

The Arbitrator finds the Respondent violated N.C. Gen. Stat. § 53-165 et.seq., and the Claimant suffered actual, compensatory damages as a result of the amount collected, received, or retained, as it was never owed. *Poe v. F&B Financial,* 23CVS7736 (N.C. Super. Ct. July 23,

Final Award                                                                                                           15

2024) ("The compensatory damages that each Plaintiff is entitled to recover is the total amount of payments made, without any offset or credit for the amount loaned or for any interest or charges whatsoever.")[12]

> **d.** **The Claimant met his Burden in Proving the Respondent Violated The North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq*. (UDTPA)** ("Third Claim for Relief").

The UDTPA provides:

> If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

N.C. Gen. Stat. § 75-16.

The Arbitrator finds TitleMax violated the UDTPA. A violation of Chapter 53 has long been a violation of Chapter 75 as a matter of law. *State ex rel. Cooper v. NCCS Loans, Inc.*, squarely addressed this issue. 624 S.E.2d 371, 174 N.C. App. 630 (N.C. Ct. App. 2005). The practice of offering usurious loans is a clear violation of North Carolina's established public policy and constitutes an unfair or deceptive trade practice within the meaning of the UDTPA. See also, *Stanley v. Moore,* 339 N.C. 717, 723, 454 S.E.2d 225, 228 (1995).

TitleMax's efforts to avoid activities in North Carolina demonstrate its knowledge of North Carolina statutes. It did not share this knowledge with "unbanked and underbanked customers who would otherwise not have access to necessary credit." (Resp't's SD Mot. at 1.) While its business practices had the patina of fairness, they primarily served TitleMax's business interest. The undisputed facts prove the Claimant violated the UDTPA.

> **e.** **Damages' Analysis**

The Claimant seeks compensatory damages for the Respondent's violation of the CFA in the amount of $21,356.28. This amount is based on Mr. Gilpin's loan transaction history. (Claimant's Ex. G.) As requested by the Arbitrator, the Respondent submitted an analysis of prospective damages based on allowing only payments made in excess of the CFA allowance. As

---

[12] The Arbitrator previously considered a claimant's assertion as a generalized right under the North Carolina Constitution. Under that analysis, the Arbitrator concluded the Constitution did confer standing but he could only collect damages in the amount of interest he paid in excess of the amount allowed under the CFA. After consideration of the arguments made by counsel and the analysis of set forth in other arbitration determinations, Federal Court and State Court opinions, the Arbitrator accepts the Claimant's argument that Article IV, Section 13 of the North Carolina Constitution provides a private right of action for Courts to "redress" wrongs-unless the statute says otherwise.

Final Award                                                                                    16

stated above, the Arbitrator has determined that the Respondent's calculation does not reflect the correct amount of damages due to Mr. Gilpin. Accordingly, the Arbitrator accepts Mr. Gilpin's calculation of damages under the CFA.

The Claimant seeks a determination of an alternative award pursuant N.C. Gen. Stat. § 75-16. Under that statute, the amount of compensatory damages calculated under the CFA would be trebled resulting in an award of $64,068.84. The Arbitrator accepts Mr. Gilpin's calculation of damages under N.C. Gen. Stat. § 75-16.

The Claimant also seeks a determination as to whether the Respondent is liable for punitive damages under N.C. Stat. §1D. (Fourth Claim for Relief). In North Carolina, punitive damages can serve the dual purpose of punishing and deterring defendants from committing similar wrongs. N.C. Stat. §1D-1 ("Punitive damages may be awarded, in an appropriate case and subject to the provisions of this Chapter, to punish a defendant for egregious wrongful acts and to deter the defendant and others from committing similar wrongful acts.") The standards for the recovery of punitive damages are set forth in N.C. Stat. §1D-15.

§ 1D-15. Standards for recovery of punitive damages.
(a) Punitive damages may be awarded only if the Claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
(1) Fraud.
(2) Malice.
(3) Willful or wanton conduct.
>   (b) The Claimant must prove the existence of an aggravating factor by clear and convincing evidence.
>   (c) Punitive damages shall not be awarded against a person solely on the basis of vicarious liability for the acts or omissions of another. Punitive damages may be awarded against a person only if that person participated in the conduct constituting the aggravating factor giving rise to the punitive damages, or if, in the case of a corporation, the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages.
>   (d) Punitive damages shall not be awarded against a person solely for breach of contract. (1995, c. 514, s. 1.)

In determining the amount of punitive damages, the decision-maker can rely on the following factors, although not all are necessary.

§ 1D-35. Punitive damages awards.
In determining the amount of punitive damages, if any, to be awarded, the trier of fact:
(1) Shall consider the purposes of punitive damages set forth in G.S. 1D-1; and
(2) May consider only that evidence that relates to the following:
>   a. The reprehensibility of the defendant's motives and conduct.
>   b. The likelihood, at the relevant time, of serious harm.

Final Award                                                                                    17

c. The degree of the defendant's awareness of the probable consequences of its conduct.
d. The duration of the defendant's conduct.
e. The actual damages suffered by the Claimant.
f. Any concealment by the defendant of the facts or consequences of its conduct.
g. The existence and frequency of any similar past conduct by the defendant.
h. Whether the defendant profited from the conduct.
i. The defendant's ability to pay punitive damages, as evidenced by its revenues or net worth. (1995, c. 514, s. 1.)

In support of his request for punitive damages, the Claimant argues that "TitleMax's conduct with regard to North Carolina customers has been ongoing for many years, and remains ongoing, and that TitleMax was aware that its conduct was unlawful. This is relevant to subparts a., b., c., d., and g. (Claimant's Pre-Hearing Brief at 4).

Specific to Mr. Gilpin, TitleMax continued to collect on his loans well into 2023, after the North Carolina Court of Appeals ruled that the "governing law" provision, which TitleMax relies on to defend its actions, does not apply to claims under the North Carolina Consumer Finance Act. Further, TitleMax continues to hold liens on North Carolina car titles even today, demonstrating that deterrence remains at issue. TitleMax continues to hold liens on other North Carolina car titles, hoping that other unsuspecting North Carolina residents are not aware of their rights. This is relevant to subpart g.

With regard to Gilpin, TitleMax continued to collect on the loans, hoping that it would not get caught and hoping that Gilpin would not hire counsel to assert his right. TitleMax never disclosed to Gilpin that its collection on the loans that it made to Gilpin violated North Carolina law. TitleMax collected more than $20,000 from Mr. Gilpin, causing harm to Gilpin and resulting in profit to TitleMax. This is relevant to subparts b., e., f. and h. (Id.)

The Claimant further argues the "Conduct of TitleMax with regard to other borrowers is expressly relevant and should be considered pursuant to N.C. Gen. Stat. § 1D-35(2)(g). Therefore, both the existence and frequency of TitleMax's past conduct is relevant. The statute does not state what weight the Arbitrator should give to this evidence but does make clear that the Arbitrator may properly consider this evidence. This includes not only the volume of other loans made, as shown by the NCDMV lien count, but also how TitleMax has dealt with other customers, and continues to deal with other customers." (Claimant's Pre-Hearing Brief at 5.)

The Respondent contends Punitive Damages are not warranted because it "voluntarily ceased making loans to North Carolina years ago and TitleMax "is currently implementing a multiple-part process as to currently outstanding loans issued to customers who . . . provided TitleMax with a North Carolina address on their loan application (the "North Carolina Customers") since early 2016." Exhibit A, ¶ 8. All of the accounts will be considered "paid in full." Id., ¶ 9. TitleMax will also release those liens on a rolling basis. Id., ¶¶10-11. Additionally, "TitleMax will notify borrowers that (1) their outstanding loan is considered paid in full; (2) TitleMax will not accept any additional payments associated with the identified loan; and (3) that

Final Award                                                                                                          18

the lien on the title to the vehicle securing the loan is released." Id. (Respondent's Pre-Hearing Brief at 3-4.)

The Respondent also argues that "if the Arbitrator feels it necessary to award punitive damages (over TitleMax's objection and opposition), the constitutionally appropriate punitive damage amount should be the same as the trebled amount as already established by state policy of the North Carolina legislature. See also *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 580, 116 S. Ct. 1589, 1601, 134 L. Ed. 2d 809 (1996) ("exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree."). (Respondent's Response to Claimant's Pre-Hearing Brief at 4.)

The Arbitrator finds the Claimant has met his burden by clear and convincing evidence that TitleMax's conduct was willful and wanton, especially as it related to Mr. Gilpin. The Respondent's business model was to victimize "unbanked and underbanked" individuals with urgent financial needs. TitleMax then deployed this strategy in North Carolina, fully aware of the limitations imposed by that state's laws. In an attempt to avoid these limitations, TitleMax included Governing Law Provisions in its Loan Agreements with the clear purpose of avoiding the application of North Carolina Law. TitleMax's business model was established to have offices in neighboring states, making it easier for North Carolina residents to travel and obtain loans. As evidenced by the statements of former employees, Titlemax targeted "unbanked and underbanked" individuals in North Carolina through advertising and direct solicitations. Current customers were solicited to refinance their loans or apply for new loans.

The Claimant has also proven the following factors: (a) the reprehensibility of the defendant's motives and conduct; (c) the degree of the defendants' awareness of the probable consequences of its conduct; (d) the duration of the defendant's conduct; (e) The actual damages suffered by the Claimant; (f) the concealment by the defendant of the facts or consequences of its conduct; and (h) the defendant profited from the conduct.

It appears that prior arbitration awards and court decisions have had a deterrent effect on the Respondent. However, punitive damages also serve the purpose of punishing the actions of the Defendant with regard to the Claimant. I find that punitive damages in the amount of $125,000 are warranted.[13]

### f.  Interim Award's Conclusions and Further Proceedings

1.     The Claimant, Daniel Gilpin, is entitled to an award of compensatory damages against Respondent TitleMax in the amount of $21,356.28 on his claim based on a violation of the North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-165, et seq. (for underlying claims) ("CFA") ("First Claim for Relief");

2.     The Claimant elected not to pursue his claim based on a Violation of North Carolina usury law, N.C.G.S. § 24-1.1 et seq. ("Second Claim for Relief"), which was pled in the alternative. Accordingly, the Claimant will take nothing on this Claim.

---

[13] This Award is based on the harm suffered by Mr. Gilpin and not the harm suffered by third parties.

3.      The Claimant, Daniel Gilpin, is entitled to an award of damages against Respondent TitleMax in the amount of $64,068.84 on his claim based on a violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 ("Third Claim for Relief").

4.      The Claimant, Daniel Gilpin, is entitled to an award of punitive damages against Respondent TitleMax in the amount of $125,000.00 as permitted by North Carolina law pursuant to N.C. Gen. Stat 1D. ("Fourth Claim for Relief").

5.      The Claimant shall make his election of remedies within 10 days of the issuance of this Interim Award. The available remedies are:  (1) an Award of $64,068.84 on his claim based on a violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 ("Third Claim for Relief") or (2) an Award of $21,356.28 on his claim based on a violation of the North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-165, et seq. (for underlying claims) ("CFA") ("First Claim for Relief") and an award of punitive damages against Respondent TitleMax in the amount of $125,000.00 as permitted by North Carolina law pursuant to N.C. Gen. Stat 1D. ("Fourth Claim for Relief").

6.      This Interim Award is a resolution of the merits of all claims submitted in this Arbitration, except for the determination of the amount of reasonable attorneys' fees and costs to be awarded in favor of the Claimant for Respondent's willful conduct. The Arbitrator retains jurisdiction to address Claimant's claims for attorneys' fees and costs, and any errors, omissions, or miscalculations. The Claimant's counsel shall prepare and file a motion for the award of attorneys' fees and costs supported by a declaration within 10 days from this Interim Award. Respondent's counsel shall then file its opposition to Claimant's Motion with 10 days of the filing of Claimant's Motion.

7.      The Claimant is entitled to pre-judgment interest, as permitted under North Carolina law, on the compensatory damages from the date of the filing of the Complaint in the U.S. District Court for the Middle District of North Carolina until the Final Award is satisfied.

8.      The Claimant is entitled to post-judgment interest on the full amount of the selected remedy as permitted under North Carolina law.

A final determination of this matter will be made upon receipt of the Claimant's damages submission, attorney fees, and costs, and replies thereto. This determination shall be embodied in a Final Award, which shall also incorporate the contents of the Interim Award. This Interim Award is not intended to be subject to review pursuant to 9 U.S.C. § 9, 10. (Interim Award at 19-20).

III.    **Analysis of Claimant's Request for Attorney's Fees, Costs, and Expenses**

On October 28, 2025, Mr. Gilpin submitted Claimant's Election and Motion for Costs and Attorneys' Fees. (Claimant's Election and Fee Application). In this submission, the Claimant elected "the higher of the two paths pursuant to N.C. Gen. Stat. 1D-20. In this case, that is the compensatory award + the punitive award = applicable interest + costs and fees." (Claimant's

Final Award                                                                                          20

Election and Fee Application at 1). The Submission also addressed the Claimant's application for attorneys' fees and costs.

The Claimant argues he is entitled to his "reasonable fees and costs for attorneys, experts, and witnesses under the terms of the relevant Loan Agreements. Accordingly, he argues that it is unnecessary to perform an analysis of "the requirements present for a fee award under Chapter 75…" (*Id.* at 2).

The Claimant in his Submission, also included a Declaration of Andrew Brown stating, among other things, that "When I charge an hourly Rate for my time it is at $500/hour. My partner James Faucher's lowest rate is $425/hour." (Brown Decl. at ¶ 4). In his Declaration, Mr. Brown describes the tasks performed and the hours expended in connection with this representation. (Brown Decl. ¶ 14.) He also seeks payment of the JAMS filing fee of $257.48.

On November 7, 2025, TitleMax submitted Respondent's Opposition to Claimant's Request for an Award of Attorney's Fees. (Respondent's Fee Award Opposition). The Respondent contends the operative statute and Law governing a fee award is N.C. Gen. Stat. § 75-16.1(1) and argues the Claimant failed to establish his entitlement to an award under this statute. The Respondent also argues that the Claimant's fee submission fails to show that any award of attorney's fees is reasonable and supported by the evidence. Specifically, the Respondent argues, "Nothing in the records before this Arbitrator provide[s] the specificity and detail necessary for finding the fees reasonable." (Respondent's Fee Award Opposition at 7).

As this Arbitrator has previously held, the Loan Agreement specifically addresses the Claimant's entitlement to "reasonable fees and costs for attorneys, experts, and witnesses." (Loan Agreements ¶ 24). While the CFA, a North Carolina statute, deems the agreement void, that statute does not render the agreement's arbitration provisions void or unenforceable. The attorney's fee provision is part of the "Waiver of Jury Trial and Arbitration Clause" in the Loan Agreement. (*Id.* ¶ 22.) Under the terms of the Loan Agreement, the Federal Arbitration Law governs the "Waiver of Jury Trial and Arbitration Agreement in Section 24." (*Id.*)

An arbitration provision, such as the provision in this matter, is severable from the underlying contract. *See Southland Corp. v. Keating*, 465 U.S. 1, 10¬–14 (1984). Therefore, North Carolina's statutory law cannot prevent enforcement of the agreement's arbitration provisions, which are governed by the FAA, even where the underlying dispute involves state law claims. Further, the Claimant's argument that the attorney's fee provisions of the arbitration agreement are not enforceable where the agreement is determined to be void ab initio under state law has been rejected by the Supreme Court. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006).

Accordingly, the Arbitrator finds that the Parties agreed that if the Claimant prevailed, he would be entitled to an award of "reasonable attorney's fees and costs." The only standard imposed under the Agreement was that the attorneys' fees and costs must be "reasonable." The requirements imposed for a fee award under N.C. Gen. Stat. 75-16.1 were neither agreed to by the Parties nor reasonably foreseeable.

In determining the reasonableness of Claimant's request for attorneys' fees and costs, the Arbitrator follows the guidance set forth in *Hensley v. Eckerhart,* 461 U.S. 424 (1983). The Supreme Court was considering Title 42 U.S.C. § 1988, which provides in federal civil rights actions the award of a "reasonable attorney's fee as part of the costs," The Supreme Court stated "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by the reasonable hourly rate." (*Id*. at 433). The Supreme Court further stated, "The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" (*Id*.)

In his Declaration, Claimant's counsel, Drew Brown, states, "$500/hour is my actual hourly rate for hourly clients and therefore a fair and reasonable rate for someone awarding attorneys' fees." (Brown Decl. ¶ 5.) He further states, "I have not charged anyone $350 myself in years. It's contingency fee, pro bono, or $500/hour. My earlier declaration in other cases do not contradict this and say I charged $350. They only say those are also reasonable rates; which I agree that they are. (*Id*. ¶ 9.)  In his Declaration, Mr. Brown also describes the tasks he and his partner, Mr. Faucher, performed and the hours they expended on each task in connection with this representation. (Brown Decl. ¶ 13.)

In the Respondent's Fee Award Opposition, TitleMax contends that "Instead of providing contemporaneous records documenting his time, Claimant's counsel submits his "attempt[] to estimate" his time that spans "hours" over "years" of representations with not a single item to support and substantiate the actual time expended with this particular Claimant. (*Id*.) (citing Decl. of A. Brown, 10/28/25, at ¶¶ 5, 14). The Respondent argues "Nothing in the records before this Arbitrator provides the specificity and detail necessary for finding the fees reasonable." (*Id*. at 7).

The Claimant's submission does lack the specificity generally required in fee applications. This is due, in part, to the unique nature of the claims asserted in this matter. The claims involve hundreds of similar but unique plaintiffs. In light of the amount in dispute, it is not reasonable to require the Claimant to present contemporaneous records showing the number of hours expended and the hourly rates for the attorneys charged for each case. Nevertheless, the Claimant's submission lacks sufficient details to warrant an award in the full amount requested. Claimant's counsel has handled hundreds of these matters, and the submissions in this case, except for the punitive damages claim, reflect minimal new legal work. For the most part, the facts are similar in all claims, and the law is fairly well established.

Under the *Hensley* methodology, the analysis begins by establishing a "lodestar" amount equal to the reasonable hourly rate multiplied by the reasonably expended hours. The Arbitrator concludes multiplying a reasonable rate of $500 per hour for Mr. Brown for 10 hours and a reasonable rate of $425 per hour for 4 hours for Mr. Faucher, produces a lodestar amount of $6,700.00. The Arbitrator also finds that an upward adjustment of the lodestar amount is appropriate in this matter.

In this matter, and a few others, the Claimant's counsel has successfully sought and obtained punitive damages awards. Pursuing this claim produced a substantially increased

Final Award                                                                                                    22

Docusign Envelope ID: 9DE6984A-200B-4967-AADA-3AFC428F1F19

recovery for Mr. Gilpin. This result warrants the application of a multiplier that would increase the attorneys' fees award to $13,400.00. The Claimant paid JAMS a $257.48 fee to initiate this Arbitration. The Arbitrator finds the Claimant is entitled to recover the $257.48 filing fee. Accordingly, the total amount of attorneys' fees and costs due to the Claimant is $13,658.13.

## AWARD

1. Based on his election, the Claimant, Daniel Gilpin, is entitled to an award of compensatory damages against Respondent TitleMax in the amount of $21,356.28 on his claim based on a violation of the North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-165, et seq. (for underlying claims) ("CFA") ("First Claim for Relief").

2. The Claimant, Daniel Gilpin, elected not to pursue his claim based on a Violation of North Carolina usury law, N.C.G.S. § 24-1.1 et seq. ("Second Claim for Relief"), which was pled in the alternative. Accordingly, the Claimant will take nothing on this Claim.

3. Based on his election, the Claimant, Daniel Gilpin, waived his entitlement to an award of damages against Respondent TitleMax in the amount of $64,068.84 on his claim based on a violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 ("Third Claim for Relief"). Accordingly, the Claimant will take nothing on this Claim.

4. Based on his election, the Claimant, Daniel Gilpin, is entitled to an award of punitive damages against Respondent TitleMax in the amount of $125,000.00 as permitted by North Carolina law pursuant to N.C. Gen. Stat 1D. ("Fourth Claim for Relief").

5. The Respondent, TitleMax of South Carolina, Inc., shall pay the Claimant, Daniel Gilpin, damages in the amount of $146,356.28.

6. The Claimant, Daniel Gilpin, is also entitled to an award of attorneys' fees and costs. The Respondent, TitleMax of South Carolina, Inc., shall pay the Claimant, Daniel Gilpin, attorneys' fees and costs in the amount of $13,657.48.

7. The Claimant, Daniel Gilpin, is entitled to pre-judgment interest and post-judgment interest as permitted under North Carolina law, based on the damages awarded in this Final Award.

This Final Award resolves all claims between the Claimant, Daniel Gilpin, and the Respondent, TitleMax of South Carolina, Inc., submitted for determination in this proceeding.

Date   12/2/2025 | 6:29 AM PST

DocuSigned by:

*Gregory P. Miller*

AAB3CE0620514D5.

Gregory P. Miller, Esquire
Arbitrator

Final Award                                                                23